UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GERMAN CRUZ GARCIA,<br><br>*Plaintiff*,<br><br>v.<br><br>GGI GLASS DISTRIBUTION CORP. et al.,<br><br>*Defendants*, | Civil Action No. 22-632 (TJK) |

**MEMORANDUM OPINION & ORDER**

While German Cruz Garcia was unloading glass panels during a building renovation, some panels fell from the delivery truck and injured him. So he sued two companies, GGI Glass Distribution Corporation and EuroProjects International, Inc. (which does business as Adotta America) that were also working on the renovation. He alleges that the accident happened because the truck was not parked on level ground—a mishap that he attributes to Defendants' negligence. In support of this theory, he proffers William Alcarese as an expert witness to testify about the industry standard for unloading glass and about several ways in which Defendants violated federal regulations and a D.C. statute. Moving in limine, Defendants seek to exclude that testimony. Because Alcarese's testimony consists of an unreliable conclusion about the industry standard and other opinions that rest on that unreliable premise, the Court will grant Defendants' motions.

**I.     Background**

In early 2019, several companies were working on a building renovation in downtown Washington, D.C. Defendant Adotta America had hired Defendant GGI Glass Distribution Corporation to "manufacture and deliver" glass panels "to the job site." ECF No. 42-1 at 6. GGI

would deliver the panels on a truck for Move It All 24-7, LLC to unload and move into the building. ECF No. 42-1 at 6; *see also* Complaint, ECF No. 1-2 ¶ 5.

Plaintiff German Cruz Garcia was working for Move It All in 2019 at the renovation site. Compl. ¶¶ 5–6. He alleges that in January of that year GGI made a delivery without properly securing the glass. *Id.* ¶ 9. More problematically, in his view, "the truck was parked on a driveway that was not level." *Id.* When Garcia and the crew started unloading the glass, several panels fell and injured him. *Id.* ¶¶ 10–11.

Garcia sued GGI and Adotta about three years later for negligence and negligence per se. *See* Compl. ¶¶ 14–53. He also brought as separate claims several theories of liability, such as "inherently dangerous condition," which the Court dismissed because these theories are not independent causes of action. *See* Minute Order of May 2, 2022; Minute Order of February 6, 2024. In July 2023, Garcia disclosed two expert witnesses under Federal Rule of Civil Procedure 26(a)(2). He claims that the second expert, William Alcarese, is "an expert in the field of workplace safety" who will discuss "standards in the industry" and how Defendants' breach of their duties led to Garcia's injuries. ECF No. 29 at 4. Defendants move in limine to exclude this testimony under Federal Rule of Evidence 702. *See* ECF No. 40; ECF No. 41.

## II. Legal Standard

This Court has "'broad discretion in determining whether to admit or exclude expert testimony.'" *Campbell v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281, 296 (D.D.C. 2018) (quoting *U.S. ex rel. Miller v. Bill Harbert Int'l Constr.*, 603 F.3d 871, 895 (D.C. Cir. 2010)). Federal Rule of Evidence 702, which governs the admissibility of expert testimony, guides that discretion by providing that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the" party offering the testimony shows "that it is more likely than not that:

    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b) the testimony is based on sufficient facts or data;

    (c) the testimony is the product of reliable principles and methods; and

    (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."

These guideposts direct the Court "to act as a 'gatekeeper' for expert testimony." *Campbell*, 311 F. Supp. 3d at 296 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). In that role, the Court must ensure that "all expert testimony" is "not only relevant, but reliable." *Id.* (internal quotation marks and citation omitted). This reliability inquiry focuses on the "principles and methodology" underlying the proposed testimony. *Ambrosini v. Labarraque*, 101 F.3d 129, 133 (D.C. Cir. 1996). Even reliable expert testimony, though, must be "helpful to the trier of facts in th[e] case." *Parsi v. Daioleslam*, 852 F. Supp. 2d 82, 88 (D.D.C. 2012). Put differently, reliable expert testimony must still be "sufficiently tied to the facts of the case that it will aid the [factfinder] in resolving a factual dispute." *Rothe Dev., Inc. v. Dep't of Def.*, 107 F. Supp. 3d 183, 197 (D.D.C. 2015) (quoting *Daubert*, 509 U.S. at 591). Garcia bears the burden on both points—reliability and helpfulness to the finder of fact. *See Barnes v. District of Columbia*, 924 F. Supp. 2d 74, 94 (D.D.C. 2013).

**III.    Analysis**

Alcarese's proposed expert testimony proceeds in two parts. First, he offers his opinion on the "industry wide standard" for unloading glass. *See* ECF No. 29-1 at 2. This standard, he says, provides that the removal of glass from delivery trucks should occur only when the truck is parked on a level surface, so the failure to heed that standard is "an industry recognized hazard." *Id.* Second, Alcarese's report includes a section on "Violations of Laws, Rules and Regulations." *Id.* at 3. In his view, Defendants violated several regulations of the Occupational Health and Safety

Administration ("OSHA"), as well as § 32-808(a) of the D.C. Code, *see* ECF No. 29-1 at 5–8, in part because they parked the truck on unlevel ground for unloading. The Court addresses these aspects of Alcarese's report separately because the "process of parsing expert testimony is consistent with Rule 702's liberal admissibility standards." *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 665 (2d Cir. 2016) ("[D]istrict courts are not obligated to prune away all of the problematic elements of an expert's proposed testimony to save the remaining portions, however small.") (citations omitted).

Before doing so, the Court acknowledges Adotta's threshold argument that the expert testimony Alcarese proposes to offer is unnecessary. Specifically, Adotta says that the subject of that testimony—*i.e.*, the standard of care for unloading glass—is "within the realm of common knowledge and everyday experience" such that expert testimony is not required under D.C. law. *Briggs v. Washington Metro. Area Transit Auth.*, 481 F.3d 839, 845 (D.C. Cir. 2007) (citation omitted). Of course, arguing that Alcarese's testimony is *not required* is not necessarily the same as arguing that it is *impermissible*.[1] But charitably interpreted in the context of its *Daubert* motion,

---

[1] Adotta relies on cases addressing whether D.C. law *requires* expert testimony to establish negligence. *See Varner v. District of Columbia*, 891 A.2d 260, 265–67 (D.C. 2006) (no abuse of discretion "in holding that, without expert testimony, there was insufficient evidence of negligence"); *Robinson v. Washington Metro. Area Transit Auth.*, 774 F.3d 33, 39 (D.C. Cir. 2014) (citing D.C. caselaw and explaining that "an expert is necessary unless the subject matter is 'within the realm of common knowledge and everyday experience' of average jurors" (citation omitted)); *Yumeisun v. Washington Metro. Area Transit Auth.*, 2016 CA 934 V, 2018 D.C. Super. LEXIS 129, at *8–9 (Jan. 9, 2018) (citing D.C. caselaw and explaining that expert testimony is required "where the subject presented is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson" (citation omitted)). In this case, the answer is not obvious. "The D.C. Court of Appeals has required expert testimony" in cases that implicate safety and standards of care, even though those cases "appear to be within the realm of common knowledge." *Briggs*, 481 F.3d at 845. That court has held, for example, that "expert testimony was necessary to establish the standard of care" in a case involving alleged negligence in handling a leaning tree, *Katkish v. District of Columbia*, 763 A.2d 703, 704–05 (D.C. 2000), and in a case involving crowd control in a church, *see Hill v. Metro. African Methodist Church*, 779 A.2d 906,

Adotta's argument seems to be that "the jury is just as competent to consider and weigh the evidence" about the standard of care for unloading glass, so "it is improper to use opinion evidence" here. *Gilmore v. Palestinian Interim Self-Government Auth.*, 843 F.3d 958, 973 (D.C. Cir. 2016). Put another way, because ordinary people can comprehend the dangers of unloading heavy (and fragile) things from a vehicle, there is no basis to find that Alcarese's testimony could help a jury. The Court need not decide that question, because Alcarese's testimony must be excluded for more specific and straightforward reasons.

### A. The Industry Standard of Care

Garcia offers Alcarese's expert testimony in part to explain the "standards in the industry." ECF No. 29 at 4. The expert report clarifies that part of this testimony will include Alcarese's opinion on the standard of care for "unloading . . . glass to and from glass delivery trucks." ECF No. 29-1 at 2. As Alcarese sees it, failure to comply with this standard creates an "industry recognized hazard"—one that he believes caused the accident here. *Id.* For this proposed testimony to pass muster, Alcarese must have based his opinion on sufficient data or facts, and he must have reliably applied reliable principles and methods. Because Alcarese did neither, the Court will exclude this first part of his proposed testimony.

Start with the facts and data that Alcarese relied on in forming his opinion about the "industry wide standard" for unloading glass. ECF No. 29-1 at 2. On this point, most of the materials he claims to have reviewed are largely irrelevant. Neither Garcia nor Alcarese explains how the bulk of the materials—photos of the accident site, "miscellaneous emails," incident reports, building regulations, interrogatory responses, and "site glass delivery tickets" to name a few, *see id.* at

---

907–10 (D.C. 2001). But whether expert testimony is *required* in this instance is a merits question that the Court need resolve to conclude that Alcarese's proffered expert testimony should be excluded.

1—would provide enough information or data for someone lacking experience in this industry (like Alcarese) to form a reliable opinion about the industry standard. The only self-evidently relevant material in Alcarese's list is "[g]eneral industry information regarding glass handling and delivery." *Id.*

According to Alcarese, the crux of this "[g]eneral industry information" is an online article that the editor of a trade-association magazine published over nine years ago. *See* ECF No. 29-1 at 1–2. Alcarese claims that the article came from the National Glass Association, the "largest trade association for the auto glass, architectural glass, and window and door markets." *Id* at 2. And he identifies the author as Katy Devlin, an editor, who wrote the article in NGA Glass Magazine (the "Devlin Article") and made "pointed remarks that . . . unloading of glass to and from glass delivery trucks" should happen only when vehicles are on "level" ground. *Id.* Alcarese considers this view—that "level" ground is required for unloading—"an industry wide standard." *Id.*

That single data point about the industry standard is a far cry from the "sufficient facts or data" that Rule 702 contemplates. Alcarese claims no experience with the glass industry. Nor has he "provided any consulting work" for a glass-manufacturing company or, for that matter, "any type of transportation or trucking company." ECF No. 42-15 at 6. And although an article from a large trade association might give him "some sense" of common industry practices, that is not enough to establish a sufficient factual or data-driven basis for his conclusion about the industry standard. *Estate of Gaither ex rel. Gaither v. District of Columbia*, 831 F. Supp. 2d 56, 65–66 (D.D.C. 2011) (excluding proposed expert testimony about the reasonableness of a judge's sentencing practices where witness had only "*some* knowledge of [the judge's] sentencing habits"

(emphasis in original)). At most, the article is a starting point for additional research—a source that someone unfamiliar with the industry might parlay into other materials and information.

Worse still, Alcarese admits that he does not "recall digging much further" once he "found" the purported industry standard in the National Glass Association material. ECF No. 42-15 at 12. Garcia argues that Alcarese, responding to a "records subpoena," provided "a wealth of industry materials and other documents" to support his conclusion about the industry standard. ECF No. 42-1 at 26. But Garcia bears the burden of establishing reliability, and he does not explain what those articles said or how they informed Alcarese's methodology and opinion. For his part, Alcarese never mentions *any* specific source or information in his report other than the Devlin Article—which he called the "most relevant one" in his deposition, *see* ECF No. 42-15 at 7—as the basis for his conclusion about the industry standard. He does not claim that other sources corroborated this view or that he relied on other information about glass unloading before settling on the standard of care for an industry with which he has no experience. The Court therefore cannot incorporate into the reliability analysis these unexplained sources referenced in Garcia's briefing when the proposed expert pins his conclusion to a single article.[2]

To be sure, Alcarese did not need to "examine every" article or study discussing this topic. *Campbell*, 311 F. Supp. 3d at 302 (citation omitted). But "he cannot simply rely" on a nine-year-

---

[2] Garcia attached an exhibit to his opposition that lists "Documents Relating to Analysis Opinions." *See* ECF No. 42-14. That exhibit references several other sources that, based on their titles, relate to glass safety. But again, Alcarese's report never mentions these sources or says how—if at all—they factored into his conclusion about the industry standard. His deposition also cabins his use of materials. When asked if there was "[a]nywhere else where" he came to the "conclusion that it's an industry recognized hazard other than the National Glass Association materials," Alcarese identified no other source; instead, he claimed that he "found it there" and did not "recall digging much further." ECF No. 42-15 at 12. In any event, even if this list of sources provided additional "facts and data," Alcarese's purported reliance on the Devlin Article—coupled with his failure to explain his methodology and application of it—would still render his opinion about the industry standard unreliable.

old article from a trade association "in forming his opinion[]." *Id.* In short, to stop digging after finding one source supporting Garcia's position is to leave "too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Alcarese's reliance on the Devlin Article also renders his "principles and methods" unreliable under Rule 702. To start, his report is largely silent on his process for assessing the industry standard. Alcarese identified the National Glass Association as the "largest trade association" for certain kinds of glass and then treated the association as a credible source. ECF No. 29-1 at 2. But he does not explain whether (or how) he reviewed materials from other trade associations, specific glass companies, or safety organizations. Nor does he say whether he corroborated the National Glass Association's view from over nine years ago, either by reviewing other sources or speaking with people knowledgeable about the industry. Although Alcarese mentions "[g]eneral industry information," ECF No. 29-1 at 1, that "generalized and non-specific description" of the materials he reviewed "falls short of" establishing that his "testimony is based on a reliable methodology." *Arias v. DynCorp.*, 928 F. Supp. 2d 10, 23–24 (D.D.C. 2013).

Even if this kind of method could be reliable, Alcarese did not reliably apply it here, as Rule 702 requires. A close examination of the Devlin Article shows why. That article explains how "[c]utting corners when transporting glass . . . can be costly" because "[g]lass breakage hits the bottom line." ECF No. 42-19 at 1. That perspective should not be surprising. The National Glass Association seeks to "[p]romote best practices" and "safety" in the workplace, but its "core purpose" is to help industry members "grow successful businesses and . . . champion the benefits of glazing and glass building products." *See* National Glass Association, *About NGA*, https://perma.cc/RV2S-C5SH (last visited Sept. 19, 2024). And while a business-oriented article might offer details into an industry standard of care, this one does not—at least not in the way

8

Alcarese says it does. Indeed, the Devlin Article focuses on the importance of "glass transport racks" and "personal protective equipment." ECF No. 42-19 at 1, 3. Homemade racks, Devlin explains, are a no-go because of "rust and degradation"; gloves and reflective clothing, on the other hand, help prevent "workman's comp claim[s that] can cost a company $50,000." *Id.* at 2–3.

And Devlin's "pointed remarks" explaining the "industry wide standard" that glass should be unloaded only if the vehicle is level? ECF No. 29-1 at 2. They are not even hers. Instead, in a twelve-sentence column to the right of the Devlin Article on the Glass Magazine website, "Robin Donker"—a "marketing manager" for "Unruh Fab Inc."—offers some "[t]ips for glass loading and unloading." ECF No. 42-19 at 1. According to Donker, people unloading glass should "make sure the vehicle is on a flat, level surface" to "aide [sic] in preventing the glass from falling" and causing "injury and loss of product." *Id.* That's it.

In some cases, a source might be so authoritative that it alone can provide sufficient factual support for an expert to form an opinion on an industry standard of care. But to put it mildly, this article is not that source. Here, Alcarese's reliance on the "tips" from the Devlin Article—in truth, from the adjacent column by Donker—can only be described as reflexive and uncritical. Take his word for it: he stopped "digging" after he "found" the purported standard from the National Glass Association. ECF No. 42-15 at 12. And this kind of reliance shows that he failed to reliably apply whatever methods or principles he brought to bear on the issue of the industry standard. For all these reasons, the Court will exclude the first part of Alcarese's proposed expert testimony in which he opines on the industry standard for glass delivery and unloading.

B. **Defendants' OSHA and D.C. Code Violations**

The other part of Alcarese's proposed testimony addresses Defendants' "Violations of Laws, Rules and Regulations." ECF No. 29-1 at 3. He asserts that Defendants fell short of their worksite-employer responsibilities by "violating" several "OSHA standards/policies." *Id.* at 5

9

(citing five OSHA regulatory provisions). For instance, Defendants apparently violated 29 C.F.R. § 1926.250(a)(1)—which requires "materials stored in tiers" to be "secured to prevent sliding, falling or collapse"—because the truck was on a five-degree slope for unloading. *See* ECF No. 29-1 at 5. They also, in Alcarese's view, "violated the DC Code [§] 32-808(a)" by permitting the unloading despite "knowing that the delivery truck was in an unlevel position." *Id.* at 8.

The Court will exclude this part of Alcarese's proposed testimony as well because it consists of opinions that rely on his conclusion about the industry standard that, as explained above, is unreliable. The proposed testimony about violations of OSHA regulations and the D.C. Code thus includes "conclusions" that are not "supported by good grounds for each step in the analysis." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). In other words, the "assumption upon which [Alcarese's] report relied was insufficient to validate his opinion" about these violations, so a key "step" in his analysis is unreliable. *In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1001–02 (8th Cir. 2019); *see also In re Mirena Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 436 (S.D.N.Y. 2016) (excluding opinion on specific causation because that opinion was "based on [the expert's] general causation opinions," which were "not based on reliable methodology and principles").

The Court reads Alcarese's report—which he certifies "is a complete and accurate statement of all [his] opinions and the basis and reasons for them to which [he] will testify"—as opining on various regulatory and statutory violations that flow from Defendants' breach of the industry standard of care for glass unloading. *See* ECF No. 29-1 at 8. For example, citing "19CFR1926.21(b)(4)," Alcarese asserts that GGI "failed to ensure [that] their driver . . . understood the hazards of parking on unlevel surfaces" because the truck was parked on a "5 degree slope." ECF No. 29-1 at 6. His conclusory assertion that GGI failed to instruct its employee of

the unlevel-surface hazard—perhaps a reference 29 C.F.R. § 1926.21(b)(4)—rests on his opinion that the unlevel surface *is* an industry-recognized hazard.[3] So the unreliability of that conclusion, as described above, undermines this opinion too.

The same flaw permeates Alcarese's opinions about other violations of OSHA and the D.C. Code. He claims that Defendants were in "non-compliance" with 29 C.F.R. § 1926.250(a)(1). The only asserted basis for non-compliance, though, is "the positioning of the truck on unlevel ground." ECF No. 29-1 at 6. And when describing the alleged failure of the "defendant contractors" to comply with 29 C.F.R. § 1926.20(b)(1)–(2), Alcarese concludes that "[i]n sum," they "failed to follow industry wide glass unloading standards in placing the truck on unlevel ground." ECF No. 29-1 at 6. Finally, he asserts that "Defendants violated DC Code [§] 32-808(a) by not furnishing a safe place of employment in that the glass was allowed to be unloaded knowing that the delivery truck was in an unlevel position." ECF No. 29-1 at 8.

Thus, Alcarese's proposed testimony about OSHA and D.C. Code violations is intertwined with his unreliable conclusion that the industry standard of care requires level unloading of glass. And he identified no other basis to fill the gap. When asked for sources beyond the National Glass Association supporting his "conclusion" that unloading glass from an unlevel vehicle is "an industry recognized hazard," Alcarese provided none—not an OSHA regulation, D.C. Code provision, or any independent ground. *See* ECF No. 42-15 at 12 ("I found it there and I don't really . . . recall digging much further."). Putting a finer point on the issue, Alcarese admitted that he is "unaware of any standard that talks about . . . delivering glass on level surfaces, other than the industry practices that are outlined by folks just like this Glass Association[.]" *Id.* As described above, his

---

[3] Alcarese appears to make two citation errors: *19* C.F.R. § 1926.21(b)(4) does not appear to exist and, even assuming he meant *29* C.F.R. § 1926.21(b)(4), he has cited a provision addressing "job site areas where dangerous plants or animals are present."

conclusion about that industry standard is unreliable, so his claims of regulatory and statutory violations that depend on that standard are too.

Moreover, even if Alcarese's proposed testimony is construed slightly differently, several problems seem likely to remain. What if, for instance, Alcarese proposed to testify that the mere fact that the truck was unlevel establishes the asserted OSHA and D.C. Code violations, *separately and independently* from the purported industry standard derived from the National Glass Association material? Such testimony—at least based on his current report—would probably run into its own reliability problems because an expert's "*ipse dixit* conclusion" that "leav[es] his inferences unspoken" is inadmissible. *Evans v. Aramark Sports & Ent. Servs., LLC*, No. 19-cv-2092 (RMM), 2022 WL 19520781, at *14 (D.D.C. Nov. 22, 2022). And without a reliable conclusion about the industry standard of care, Alcarese's report would boil down to a "list containing cursory summaries" of regulations and statutes without the key component: an explanation of the putative violations showing how Alcarese applied a reliable methodology or principle to reach the conclusions he did. *Arsanjani v. United States*, No. 19-cv-1746 (JEB), 2023 WL 3231101, at *7 (D.D.C. May 3, 2023) (holding that there was "too great an analytical gap between the [citations] [of the expert] and the opinion offered (quoting *Joiner*, 522 U.S. at 146 (first alteration in original))).[4]

---

[4] Consider Alcarese's conclusion that GGI violated an OSHA regulation by failing to ensure its driver knew about the hazards of parking on unlevel services. Alcarese never explains why parking on a five-degree slope creates a hazard that triggers this obligation. Based on his proposed testimony about the "industry wide standard," the unstated inference is that the standard calls for a completely level surface and that any deviation from the standard—no matter how slight—creates an "industry recognized hazard." ECF No. 29-1 at 2. But that inference rests on an unreliable conclusion about the industry standard and thus cannot support an opinion that GGI violated it by failing to teach its driver about the hazard of parking on a five-degree slope. All that is left, then, is Alcarese's assertion that the small slope alone establishes the OSHA violation—in other words, an ipse dixit conclusion lacking "any explanation" for how Alcarese's methods or principles "rendered his subjective assessments" about the slope and OSHA regulation "reliable." *Arsanjani*, 2023 WL 3231101, at *5–7 (excluding testimony where expert failed to explain the

Next, although the Court does not understand Alcarese's report to be opining that Defendants' alleged OSHA and D.C. Code violations establish the standard of care (and its breach) under a negligence per se theory, such testimony would likely suffer from the problem just described: the premise of the opinions that Defendants violated the regulations and statute is unreliable, so the resulting conclusions are too.

In addition, some of that testimony might also be "inadmissible" as "contrary to law." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1063 (N.D. Ill. 2022) (citation omitted); *see also Cave v. Saxon Mortg. Servs., Inc.*, Nos. 11-cv-4586, 12-cv-5366 (JRP), 2015 WL 6153754, at *9 (E.D. Pa. Oct. 20, 2015) (collecting cases). Indeed, "courts routinely preclude those portions of an expert's report that are premised on a misunderstanding of the law." *Exela Pharm. Scis., LLC. v. Eton Pharms., Inc.*, No. 20-cv-365 (MN), 2022 WL 806524, at *3 (D. Del. Feb. 8, 2022). And Alcarese's proposed testimony about OSHA regulations and the D.C. Code—even if offered as evidence of negligence per se—seems to be on shaky legal footing. For example, he claims that Defendants violated 29 C.F.R. § 1926.250(a)(1), which states that "[a]ll materials stored in tiers shall be stacked, racked, blocked, interlocked, or otherwise secured to prevent sliding, falling or collapse." But this regulation seems to be inapplicable for several reasons. First, § 1926.250(a) appears to obligate employers to stack or otherwise *secure materials* in a certain way—not to *park trucks* in a specific manner. Alcarese's opinion, though, focuses on how the truck was "position[ed]," not on how the materials were stacked. ECF No. 29-1 at 6. And second,

---

"methodology he applied to reach the conclusion that the 'hazardous situation'" had existed for some time). To take another example of his conclusory reasoning, Alcarese asserts that "[t]here is no record of" a "competent person" frequently or regularly inspecting job sites and materials. ECF No. 29-1 at 5–6. But his report does not explain what qualifications would make someone "competent," nor does it say why a person's absence on *one* day shows that the person did not frequently and regularly perform inspections. Phrased in *Daubert* terms, Alcarese thus provides no basis for assessing the methodology or principles underlying this conclusion.

a federal court has reasoned that this regulation—which addresses requirements for *storage*—"would not apply until" the materials "were stored after being unloaded from the truck" transporting those materials.  *Fielder v. R.V. Coleman Trucking, Inc.*, No. 16-cv-23 (FPS), 2018 WL 1384121, at *4 (N.D.W. Va. Mar. 19, 2018).

Other purported violations of regulatory and statutory provisions also seem to face a steep climb as evidence of negligence per se.  Alcarese concludes, for instance, that Adotta violated 29 C.F.R. § 1926.20(b)(1) and (b)(2) by not "follow[ing] [its] own [safety] program."  ECF No. 29-1 at 5–6.  But he never explains why the failure to heed voluntarily adopted safety protocols necessarily violates a regulation addressing "[g]eneral safety and health provisions" and calling for employers to "initiate and maintain such programs as may be necessary to comply with this part."  § 1926.20(b)(1).  The mere "fail[ure] to meet [a company's] own standard of care says nothing, without more, about whether [the company] met the *applicable* standard of care" or the regulatory obligation to have *a* safety program.  *Nat'l Tel. Co-op. Ass'n v. Exxon Corp.*, 38 F. Supp. 2d 1, 11 (D.D.C. 1998) (emphasis in original).  If Adotta's program "exceeded the requirements of" the OSHA regulation, then a "deviation from internal practice would not necessarily prove that" Adotta violated that regulation.  *Id.*  Moreover, the D.C. Code provision that Alcarese cites is likely too generalized to "establish a standard for negligence *per se* purposes" because it "merely repeat[s] the common law duty of reasonable care" and does not "set forth specific guidelines to govern behavior."  *Sibert-Dean v. Washington Metro. Area Transit Auth.*, 721 F.3d 699, 703 (D.C. Cir. 2013) (internal quotation marks and citation omitted).  Indeed, that provision tracks the reasonable-care standard by requiring employers to "furnish a place of employment which shall be *reasonably* safe."  D.C. Code § 32-808(a) (emphasis added).

Finally, Alcarese's proposed testimony about OSHA and D.C. Code violations lies in tension with the "well-established" "rule prohibiting experts from providing their legal opinions or conclusions." *In re Initial Public Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) (internal quotation marks and citation omitted) (explaining that this rule "is often deemed a basic premise or assumption of evidence law—a kind of axiomatic principle"). This limitation recognizes that expert testimony "consist[ing] of legal conclusions . . . cannot properly assist the trier of fact" in "understand[ing] the evidence or . . . determin[ing] a fact in issue." *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997) (quoting Fed. R. Evid. 702). For that reason, such conclusions "intrude upon the duties of, and effectively substitute for the judgment of, the trier of fact and the responsibility of the Court to instruct the trier of fact on the law." *U.S. ex rel. Mossey v. Pal-Tech, Inc.*, 231 F. Supp. 2d 94, 98 (D.D.C. 2002).

Alcarese's report is couched in "legal term[s] of art." *Burkhart*, 112 F.3d at 1213. Drawing on "specialized legal meanings," *id.* at 1212, Alcarese opines that Adotta failed to comply with "Accident Prevention Responsibilities," *see* ECF No. 29-1 at 6 (citing "OSHA 29CFR1926.20(b)"), and that Defendants violated the D.C. Code "by not furnishing a safe place of employment," *id.* at 8 (citing D.C. Code § 32-808(a)). Nor does he merely "offer his opinion as to facts that, if found, would support a conclusion that the legal standard was satisfied." *Burkhart*, 112 F.3d at 1212–13. Rather, he states in no uncertain terms—and in a section titled "Violations of Law, Rules and Regulations"—his "conclusion" that "the DC Code and OSHA standards referenced above were violated." ECF No. 29-1 at 3, 8; *see also id.* at 5 ("I am of the opinion that these employers . . . also violat[ed] the following OSHA standards/policies."); *id.* at 6 (discussing "non-compliance" with OSHA regulation and "violat[ion]" of the D.C. Code); *id.* at 7 ("[T]he unsafe conditions explained in this report violated the OSHA standards mentioned above

15

and the Code of the District of Columbia."); *id.* at 8 ("Defendants violated the DC Code [§] 32-808(a).").[5]

To reiterate, the Court finds that Alcarese's testimony about regulatory and statutory violations is unreliable because his opinions rest on an unreliable premise—namely, his conclusion about the industry standard of care. But even aside from that problem, there are an array of other reasons why his proposed testimony appears to be unreliable or otherwise inadmissible.

## IV.     Conclusion and Order

For all the above reasons, it is hereby **ORDERED** that Defendants' Motions in Limine, ECF Nos. 40 & 41, are **GRANTED**.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 19, 2024

---

[5] In addition, courts in this District have also suggested that to the extent a plaintiff may "present expert testimony concerning the interpretation of the statutes and regulations relied upon" in a negligence per se case, the regulatory terms or scheme should be sufficiently "complex as to warrant expert testimony." *Ball v. George Wash. Univ.*, No. 17-cv-0507 (DLF), 2018 WL 11241285 at *2 n.2 (D.D.C. Aug. 23, 2018) (citation omitted) (excluding expert's "legal interpretations and conclusions"); *see also Nat'l Ass'n of the Deaf v. Dist. Hosp. Partners, L.P.*, No. 14-cv-1122 (RC), 2016 WL 447444, at *5 (D.D.C. Feb. 4, 2016) ("[T]he Court does not agree that the legal factors set out in that regulation are sufficiently complex . . . to warrant expert testimony that is couched in legal conclusions.").